# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-1545

JAMES YOUNG,

*Plaintiff-Appellant,*

v.

JO ANNE B. BARNHART,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 02 C 257—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED SEPTEMBER 15, 2003—DECIDED APRIL 2, 2004

_____

Before POSNER, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* James Young applied for Social Security disability benefits, claiming that he suffered from progressively declining cognitive abilities and increasing personality problems which interfered completely with his ability to work. The Social Security Administration ("SSA") denied Young's application and upon review, the administrative law judge ("ALJ") determined that Young was not disabled. The Social Security Appeals Council denied Young's request for review. Young now appeals from the district court's judgment upholding the denial of benefits. Because we find that ALJ's residual functional capacity

assessment and hypothetical question to the vocational expert were flawed, we reverse and remand for further proceedings.

## I.

Young, a fifty-five year old veteran, applied to the SSA for disability insurance benefits on July 24, 1998, claiming that as of December 31, 1992, he was no longer able to work due to an adjustment disorder with mixed features, anger control, and personality problems. These problems, he asserts, stem from a 1987 motorcycle accident and the resultant extended coma which left him with residual brain injuries. At the time of the accident he was employed as a load master with the Air Force, but was discharged in 1990 after the military determined that he was disabled. Since that time, Young has worked in many different jobs with very little success at maintaining employment. He was fired from his most recent job as a mail carrier for the U.S. Postal Service because of, among other things, his inability to understand the schedule, report to work on time, relate theory to task performance, and complete his deliveries in a timely fashion. He also has had little success in maintaining employment as a bartender, lawn laborer, or airport baggage handler. In 1996 the Department of Veterans Affairs ("VA") found that although Young's injuries were seventy percent disabling, he was 100 percent unemployable. Since 1997, Young has worked approximately thirty hours a week performing custodial duties at a bar that his wife, Tamara Young, owns.

The SSA denied Young's July 24, 1998 disability benefits application and his subsequent request for reconsideration. He fared no better before the ALJ who determined, after a May 5, 2000 hearing, that Young was not disabled. The Social Security Appeals Council declined his request for rehearing and the decision of the ALJ, therefore, is the final

decision of the Commissioner. On appeal to the United States District Court, Magistrate Judge Crocker affirmed the decision of the Commissioner. Young filed this appeal claiming that (1) the ALJ incorrectly dismissed the consultative examining doctor's psychological exam and medical opinion, (2) the ALJ erred by using a residual functional capacity assessment that did not incorporate all of the evidence, (3) the ALJ erred in creating the list of jobs that Young could perform, and (4) the ALJ made an improper credibility assessment.

The ALJ had a dizzying array of medical and psychological information to consider, including the opinions of no fewer than eight psychological and medical professionals who either examined or evaluated Young. Since we review the record as a whole, *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003), we briefly summarize some of the relevant evidence from the record here:

In August 1990, Dr. William Hathaway, a staff neurologist for the U.S. Air Force, examined Young and determined that he had poor visual memory abilities, relied on inefficient mnemonic strategies, was easily distracted during learning tasks, but performed within the normal range on a host of other memory tasks. He also found that Young had some impaired motor functioning in his left hand, problems in visuospatial functioning, and had deficits in concept formation and conceptual flexibility. Dr. Hathaway also noted displays of low frustration tolerance, irritability, "impulsivity" and a potential for poor social judgment, which he concluded substantially interfered with Young's daily performance. He recommended that the military consider Young for final medical retirement.

In 1996, the Department of Veterans Affairs determined that Young was seventy percent disabled (up from thirty percent prior) and 100% unemployable. The change in disability was based on a Veterans Administration psychological exam performed in March 1995. That exam confirmed mild cognitive deficits, impulsivity, poor social

judgment and apathy, and a drop in IQ from the above average to normal range, irritability, and short temper. The examiner noted at the time that although neuro-psychological testing showed only a mild impairment, in practice it translated into a significant impairment for Young in his social and occupational life. The Veterans Administration report indicated that Young had trouble climbing, balancing, and working in high places or places with poor ventilation. He could not perform fast-paced work or work around cluttered or slippery floors, hazardous machinery or poor lighting. He also had partial restrictions on working alone, working with others, exacting perfor-mance, repetitive work, and following instructions.

In October 1998, the state disability agency referred Young to Michael J. Ostrowski, Ph.D. for an evaluation. Dr. Ostrowski diagnosed Young with an adjustment disorder, finding that he had some symptoms of decreased mood and functioning. Dr. Ostrowski did not find pronounced memory deficiencies, but noted that he did not conduct formal memory testing. He concluded that Young would not have difficulty carrying out work-related activities such as following instructions, sustaining persistence, and adopting to change, but did note that Young's temper problems might make it difficult for Young to relate well to coworkers.

Dr. Robert Hodes, a consultative non-examining psycholo-gist completed an SSA Mental Residual Capacity Assess-ment on November 6, 1998, in which he concluded that Young was moderately limited in his ability to carry out detailed instructions, to interact appropriately with the general public, to set realistic goals, and to make plans independently of others. Dr. Hodes filled out the SSA Psychiatric Review Technique Form in which he noted the presence of pathological dependence, passivity or aggressivity and moderate difficulties maintaining social functioning. Dr. Hodes concluded that Young seemed capable of performing simple routine work.

Dr. Ward Jankus, a consulting, examining physician with the Wisconsin Department of Health and Human Services examined Young in early 1999 and determined that he had higher level memory and concentration problems and "mild higher level balance deficits." His exam focused mostly on Young's physical condition, which, with the exception of the balance problems, was largely unremarkable.

In April 1999, Dr. Jack Spear, a non-examining, consultative psychologist completed a Mental Residual Functional Capacity assessment of Young. He found some mild to moderate limitations in Young's ability to understand and remember detailed directions, and in his ability to maintain attention and concentration for extended periods. He also determined that Young was slightly to moderately limited in his ability to maintain social functioning, and noted that Young had difficulties with concentration, persistence, and pace which he described as occurring seldom to often. His ultimate conclusion was that Young had an adjustment disorder and the mental residual functional capacity to perform unskilled work with objects, rather than people or data.

Dr. Timothy Howell examined Young in July 1999, and determined that he had a short-term memory impairment, and a personality change manifested by an increased tendency to become irritable. Dr. Howell noted that Young's memory problems had interfered with his past job performance. Howell gave Young a score of fifty on the Global Assessment of Functioning Scale, indicating serious symptoms or functional limitations.

Dr. Douglas Varvil-Weld, a psychologist who, in February 2000, examined Young at the request of the ALJ, found significant deficits in Young's ability to maintain attention and concentration and to understand, remember, and carry out complex job instructions. He also found some deficits in Young's ability to use judgment, function independently, cope with work stress, and in his ability to understand, remember, and carry out even simple job instructions. Dr.

Varvil-Weld administered memory testing which revealed some memory deficiencies, including memory deficiencies affecting attention and concentration. He concluded that Young might have difficulty sustaining his efforts and persistence in a work environment. He also concluded that Young could be expected to have some difficulty with distractibility, with remembering and carrying out instructions, and with physically tolerating stress in the workplace. He found no evidence that he would have difficulty working effectively with others.

The medical expert, Dr. Kenneth Sherry, testified at Young's May 5, 2000 disability hearing. Although he could not explain the degradation in Young's memory functioning between the 1990, 1998, and 1999 evaluations on the one hand and Dr. Varvil-Weld's testing in March 2000, he did report that Young had problems with visual-spacial memory, higher cognitive functioning, and some visual memory problems. In addition, he was able to conclude that Young would have problems with concentration, persistence, and pace—problems that might occur frequently or often. Although Dr. Sherry noted that Young had lost two jobs due to his temper and that those behavior problems might be part of his organic mental syndrome, he had trouble evaluating whether Young would suffer from deterioration and decompensation in work or work-like settings.

The ALJ also heard the testimony of Young and his wife. Young testified that he often had trouble remembering things, and that these memory deficits have caused him great trouble in work settings. He testified that he lost his job with the post office because he could not remember the routes and procedures, and that at his wife's bar he forgets to put away cleaning supplies and sometimes triggers the security alarm. Young testified that he was fired from two jobs due to physical altercations with coworkers, and that he can no longer work as a bartender because of his temper. He also testified that he generally sticks close to home—doing housework, playing computer games, and

watching television. When he does go out socially, he relies on his wife to keep him from offending others. Tamara Young corroborated her husband's testimony, noting in particular her husband's memory and temperament problems.

## II.

The Commissioner has set forth a five-step evaluation process to determine whether a claimant is disabled. Following this process, the ALJ considered:

(1) Whether Young was currently engaged in substantial gainful activity?

(2) Whether Young had a severe impairment?

(3) Whether Young's impairment met or equaled one of the impairments listed in the SSA regulations?

(4) Whether Young could perform his past relevant work?

(5) Whether Young could make the adjustment to other work?

20 C.F.R. § 404.1520(a)(4)(i)-(iv). *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004). The process is sequential, and if the ALJ can make a conclusive finding at any step that the claimant either is or is not disabled, then she need not progress to the next step. 20 C.F.R. § 404.1520(a)(4). If the claimant makes it past step four, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of jobs that exist in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

In this case, the ALJ proceeded through all five steps of the analysis. He concluded that (1) Young had not engaged in substantial gainful activity during the relevant time

period, (SSA Decision at 7); (2) Young's impairments were severe, (*Id.* at 2, 7);[1] (3) they did not meet or equal one of the impairments listed in the SSA regulations, (*Id.* at 7-8); (4) Young could not perform his past relevant work, (*Id.* at 8); and (5) Young could, in fact, make the adjustment to work at a number of jobs which exist in the national economy in significant numbers. (*Id.* at 8-9).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC is an assessment of what work-related activities the claimant can perform despite her limitations. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations.") The RFC must be assessed based on all the relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1).

The ALJ made a determination that Young had the RFC to perform the nonexertional requirements of simple, routine, repetitive, low stress work with limited contact with coworkers and the public. (SSA Decision at 8).

Young argues, in his initial point, that the ALJ improperly rejected the medical evidence submitted by one of the medical experts, Dr. Varvil-Weld. Had he accepted the report of Dr. Varvil-Weld, Young argues, the ALJ would have found that Young's memory and concentration difficulties were far more significant than he found. Young also argues that, had the ALJ parsed the medical evidence from the other experts, he would have found that it was not, in fact, conflicting but that it supported Young's disability claim.

---

[1] If the claimant does not have a severe impairment, then the ALJ must find that the claimant is not disabled and the inquiry ends.

In reviewing the decision of the ALJ, we cannot engage in our own analysis of whether Young is severely impaired as defined by the SSA regulations. *Jens*, 347 F.3d at 212. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence. 42 U.S.C. § 405(g); *Jens*, 347 F.3d at 212; *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion. *Stevenson*, 105 F.3d at 1153.

Young complains that "the ALJ appears to give greater weight to the earlier 1990 mental status exam conducted by the VA, than to the recent mental status exam conducted in February 2000." Appellant's Brief at 19. Weighing conflicting evidence from medical experts, however, is exactly what the ALJ is required to do. *See Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (pointing out that when assessing conflicting medical evidence, an ALJ must decide, based on several considerations, which doctor to believe). And we may not re-weigh the evidence. *Jens*, 347 F.3d at 212. The ALJ did not ignore Dr. Varvil-Weld's evidence as Young maintains, but rather considered it in light of all of the other evidence before him. In considering the weight to give to the 1990 and 2000 memory examinations, the judge considered the testimony of Dr. Sherry who stated that he could not find a medical explanation for the significant drop in Young's memory function, and considered the fact that Young had "an incentive not do well" on the later evaluation since it was administered for the purpose of determining Young's eligibility for benefits. This conclusion is not an improper medical determination, but rather is the type of context consideration that judges regularly make when assessing the weight to attribute to conflicting evidence.

We cannot conclude that the ALJ's decision to disfavor the evidence submitted by Dr. Varvil-Weld regarding Young's mental status examination scores was not supported by substantial evidence. The ALJ evaluated the evidence submitted by the many medical experts in this case and where that evidence was conflicting, he resolved those conflicts by giving more weight to some evidence and less to others. Specifically, he concluded that Dr. Varvil-Weld's conclusions that Young had poor or no capacity to maintain attention and concentration was inconsistent with other medical opinions and worthy of less weight. This is not a case where a treating physicians' opinion was disregarded in favor of the opinion of a consulting physician. *See Books*, 91 F.3d at 979; 20 C.F.R. § 404.1527(d)(2). In this case, none of the medical experts was a treating physician. Nor was it a case where the ALJ improperly rejected an examining physician's opinion in favor of a non-examining physician's decision. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.") But in this case one examining physician's opinion was contradicted by several other examining and non-examining physicians' opinions. After weighing the evidence, the ALJ opted to believe the latter group of experts. The ALJ's decision that the evidence presented by Drs. Hathaway, Spear, Hodes, Ostrowski, Jankus, and Howell more accurately reflected Young's cognitive and memory problems was supported by substantial evidence.

This conclusion, however, resolves only half of the story. In addition to the cognitive and memory problems at issue in the conflict between Dr. Varvil-Weld's conclusions and those of the other experts, Young claims to suffer from problems involving his temper and poor social judgment. The ALJ found that Young was severely impaired by an adjustment disorder marked by blunted insight and judg-

ment, decreased mood and functioning, and an increased tendency to become irritable. (SSA Decision at 2-3). He also appears to have credited the findings of medical experts who found that Young is impulsive, apathetic, and has poor social judgment (SSA Decision at 3,4) and that he is moderately limited in his ability to carry out detailed instructions, interact appropriately with the general public, set realistic goals, make plans independently of others, and respond to criticism from supervisors (SSA Decision at 5-6). After a thorough review of the record, we are unable to determine, however, whether the ALJ's assessment of Young's RFC adequately considers these personality disorders. The ALJ concluded that Young "had the residual functional capacity to perform the nonexertional requirements of simple, routine, repetitive, low stress work with limited contact with coworkers and the public. There were no exertional limitations." (SSA Decision at 8).

Although this RFC requires that Young have limited contact with the public and coworkers, it says nothing of limiting contact with supervisors, despite the fact that there was substantial evidence within the record that Young has difficulty accepting instruction, responding appropriately to criticism, and interacting with others on the job. Nor does the ALJ explain how he reconciles Young's two conflicting limitations—the fact that Young will have difficulty accepting instruction and criticism from others on the one hand and the fact that he has difficulty making plans independently and setting realistic goals on his own on the other hand. At oral argument the attorney for the Commissioner argued that the RFC accounted for all of these mental impairments. But we are not so convinced. If the ALJ meant to capture all of Young's social and temperament problems within this RFC, he has failed to build the "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297

F.3d 589, 595 (7th Cir. 2002); *see also Steele v. Barnhart*,
290 F.3d 936, 941 (7th Cir. 2002). The ALJ has not suffi-
ciently connected the dots between Young's impairments,
supported by substantial evidence in the record, and the
RFC finding. The RFC falls short because it fails to account
for the evidence in the record regarding Young's problems
accepting instruction, responding appropriately to criticism
from supervisors, thinking independently, and setting
realistic goals.

Because the administrative judge used this RFC as the
basis for his hypothetical question to the vocational expert,
his hypothetical question also failed to include all of the
necessary information. Ordinarily, a hypothetical question
to the vocational expert must include all limitations sup-
ported by medical evidence in the record. *Steele*, 290 F.3d at
942. It is important for the vocational expert to understand
the full extent of the applicant's disability so that the expert
does not declare the applicant capable of undertaking work
in the national or local economy that the applicant cannot
truly perform. *Id.* The hypothetical need not include every
physical limitation, provided that the vocational expert had
the opportunity to learn of the applicant's limitations
through, for example, an independent review of the medical
records or through other questioning at the hearing. *Id.*
Nevertheless, where the hypothetical does not include all of
the applicant's limitations, we must have some amount of
evidence in the record indicating that the vocational expert
knew the extent of the applicant's limitations. *Id.* In this
case, the record indicates that the vocational expert testi-
fied that he had reviewed all of the contents of the exhibits
in this case and had heard the testimony presented at
Young's hearing. The exhibits included the reports of
doctors Hathaway, Ostrowski, Hodes, Jankus, Spear,
Howell, and Varvil-Weld along with the VA reports.

In many cases, imputing knowledge to the vocational
expert of everything in the exhibits and testimony from the
hearing will be sufficient to allow an ALJ to assume that

the vocational expert included all of these limitations in his assessment of the number of jobs that the applicant can perform, *Id.* at 942; *see also Ragsdale v. Shalala*, 53 F.3d 816, 820-21 (7th Cir. 1995)*; Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993); *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992), but this is not such a case. In this case, the ALJ took a different approach to the hypothetical question and decided to ask the vocational expert a series of hypothetical questions with increasingly debilitating limitations. For each question he circumscribed the exact limitations the vocational expert was to follow. He gave the following instructions:

> I want to ask you a hypothetical question. For any of these hypothetical questions please consider the claimant's age, education, and work history please. For the first hypothetical assume an individual with no exertional limitations. I'm going to modify this about three times, but we'll start off with no exertional limitations.

(R. at 247). By the nature of the questioning, therefore, the vocational expert was prohibited from considering physical, psychological, or cognitive limitations that he may have absorbed either through reviewing the evidence in the record or by listening to the hearing testimony. He was instructed to stick to the particular facts of the hypothetical along with the claimant's age, education, and work history.[2]

---

[2] We make a special note that this situation differs from the one where a vocational expert independently learned of the other limitations through other questioning at the hearing or outside review of the record and there is evidence that he accounted for these limitations. *See Steele*, 290 F.3d at 942; *Ragsdale*, 53 F.3d at 820-21*; Herron*, 19 F.3d at 337; *Cass*, 8 F.3d at 556, *Ehrhart*, 969 F.2d at 540. We do not intend to overrule that line of cases which allows a reviewing court to impute to the expert knowledge

(continued...)

The vocational expert responded to six hypothetical questions—three from the ALJ and three from Young's attorney. We can assume from the ALJ's findings, that he based his conclusions about Young's ability to work on the third hypothetical. We can make this assumption because the RFC upon which the ALJ settled in his findings corresponded exactly with his third hypothetical. That hypothetical asked the expert to assume that a claimant of Young's age, education, and work experience could perform only "simple, routine, repetitive, low stress work with limited contact with coworkers and limited contact with the public." (R. at 247-49). In response to this hypothetical question, the vocational expert concluded that Young was functionally capable of working as a sorter (light or sedentary), a packager (medium, light, or sedentary), an assembler (light or sedentary) or an inspector (light or sedentary).[3]

The hypothetical questions presented by the ALJ, like the flawed RFC on which they were based, made short shrift of Young's social and temperamental impairments. Even accepting the ALJ's decision to give limited weight to Dr. Varvil-Weld's testing and evaluation, the hypothetical questions failed to include all of the limitations supported by the medical evidence in the record from the other experts whose assessments the ALJ did credit. For example, the hypothetical failed to account fully for the findings of almost all of the credited medical experts that Young had

---

(...continued)
of limitations that were not specifically included in the question but included elsewhere in the record or hearing testimony.

[3] The ALJ subsequently concluded that, given the limitations listed in the RFC (which corresponded exactly to hypothetical question number three), Young could perform three categories of work in the economy—that of sorter, packager, and assembler. We assume that his omission of the inspector positions was simply an error.

significant impairments in social judgment. For example, Dr. Hathaway found, "continued indications of impulsivity, poor social judgment, and interpersonal difficulties . . . . The fact that he has not maintained any consistent gainful employment since the accident suggests that these factors substantially interfere with his daily performance." (R. at 173). The Veterans Administration report noted that Young had "partial restrictions on working alone, working around others, exacting performance, repetitive work, following instructions," and noted that "given his impairment in concentration, learning, and interacting with others, it is reasonable to conclude that his disabilities would prevent him from obtaining and maintaining gainful employment." (R. at 121-22). Dr. Ostrowski found some symptoms of decreased mood and functioning, and stated that "relating to co-workers may prove difficult." (R. at 127). Dr. Spear concluded that Young was moderately limited in his ability to interact with the general public, to accept instruction, and to respond appropriately to criticism from supervisors. (R. at 145). Finally, Dr. Hodes checked a box diagnosing Young with pathological dependence, passivity, or aggressivity and also found him to have moderate limitations in his ability to interact with the public and make plans independently of others. (R. at 137).

For all of the same reasons that the RFC fell short, the hypothetical question, which was based entirely on that RFC did as well.[4] By the time the ALJ reached the fifth step of the five-step disability evaluation process (*see supra* p. 7)

---

[4] We also agree with the magistrate and district court judges below that the hypothetical question was flawed in that it purported to tell the vocational expert what types of work Young could perform rather than setting forth Young's limitations and allowing the expert to conclude on his own what types of work Young could perform. We need not decide whether this error by itself is harmless, as we hold that the hypothetical was fatally flawed for other reasons.

the entire finding of disability or no disability hinged on the validity of the hypothetical question. When the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand. For this reason we remand the case to the SSA for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*