NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 30, 2008
Decided March 14, 2008

**Before**

JOEL M. FLAUM, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

No. 07-1729

| | |
|---|---|
| MICHAEL COLEMAN, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of |
| | Illinois, Eastern Division. |
| *v.* | |
| | No. 06 C 1887 |
| MICHAEL J. ASTRUE, Commissioner | |
| of Social Security, | Amy J. St. Eve, |
| *Defendant-Appellee*. | *Judge*. |

**O R D E R**

Michael Coleman applied for Supplemental Security Insurance (SSI) in
November 1999, claiming disability due to the lasting effects of a gunshot wound to the
right leg, asthma, substance abuse, and cognitive delay.  The ALJ denied his claim but
in 2004 the Appeals Council remanded it for evaluation of his mental condition.  After
further evaluation the ALJ found that Coleman's alleged impairments did not
separately or collectively amount to a listed impairment, and the Appeals Council
denied review.  Coleman then sought judicial review in the district court, which granted

summary judgment to the government.  On appeal Coleman raises several challenges to the ALJ's decision, but because substantial evidence supports that decision, we affirm the denial of benefits.

## Background

Coleman, 33 years old at the time of the remanded ALJ hearing, was shot in the right leg in May 1999.  The bullet lodged in his knee joint and Coleman underwent multiple surgeries to repair his fractured femur.  Following a month of rehabilitation, Coleman met with Dr. William Dzwierzynski, who noted little swelling and some limitation of knee motion.  Dr. Dzwierzynski diagnosed a perineal nerve injury and told Coleman of the injury's poor prognosis in adults.  Coleman then applied for Social Security benefits, and in March 2000, Coleman complained of knee pain to consulting physician David Evanich, who observed that Coleman walked with a right foot drop gait.  An examination later in the year by state agency doctors determined that Coleman was capable of "sedentary exertion."

Between 2000 and 2001 doctors, noting decreased sensation in Coleman's right leg and increased swelling, diagnosed deep venous thrombosis and unilateral lower extremity edema.  Yet there is no documentation in the record that Coleman underwent any sort of treatment for his knee injury until 2003 when he was incarcerated for theft.  During a routine medical examination in April 2003 while incarcerated, Coleman did not complain of right leg pain or use any device to walk.  Shortly thereafter, though, he asked for and received a lower bunk, cane, and slow walk pass.

The medical records also reveal that Coleman attended a drug treatment program for approximately two weeks in May 2001.  The medical report he filled out shows that Coleman had used alcohol, cocaine, heroin, and marijuana.  In addition, throughout the relevant time period, Coleman reported and was treated for asthma in various emergency rooms.  Finally, in March 2001, psychologist William Hilger, Jr. evaluated Coleman's mental functioning before the first ALJ hearing.  Dr. Hilger noted that although Coleman obtained a full scale IQ score of 59, he had put forth "a questionable level of effort," and therefore the test results provided only "minimal estimates" of Coleman's mental, academic, and intellectual functioning.

In 2005, in anticipation of the remanded ALJ hearing, Dr. James Elmes, an orthopedic specialist, examined Coleman and assessed his functioning.  According to Dr. Elmes, the examination showed that Coleman, using a cane for ambulation, had a

healed fracture and post-traumatic arthritis of the right knee. Dr. Elmes opined that Coleman was limited to occasionally carrying less than 10 pounds, walking less than two hours in an eight-hour workday, alternating sitting and standing to relieve right knee pain, and occasionally climbing stairs and ramps. Dr. Elmes also noted that Coleman should never kneel, crouch, or crawl.

At the remanded hearing Coleman testified that he dropped out of school in the ninth grade. Although he claimed that he had been in the "slow class," available school records do not show Coleman as having attended special education classes. Rather, he received satisfactory achievement marks in both the seventh and eighth grades. Coleman also stated that he failed the GED admission examination and thus never took the GED test. Coleman held several jobs prior to suffering the gunshot wound, including working as a bus boy, warehouse stocker, carwash attendant, and cook while incarcerated in the early 1990's.

Coleman testified that it would be difficult for him to work because of the gunshot wound and his inability to learn or read well. However, he admitted that he had been able to learn and perform previous jobs without trouble, and stated that he could add numbers, count change at a store, and read a receipt. Moreover, Coleman passed both the written and driving tests in Illinois and Wisconsin. He also testified that he could take public transportation by himself, lift a gallon of milk or twelve-pack of soda, and stand for fifteen minutes before his right leg became stiff. Coleman claimed that he could sit with both feet on the floor for only thirty minutes and that he uses a cane when outside the house.

Grace Gianforte, a vocational expert, also testified at the remanded ALJ hearing. Noting Coleman's semi-skilled and unskilled past relevant work experience, Gianforte considered jobs for a hypothetical person of Coleman's age, education level, and work experience. The ALJ instructed Gianforte to assume that the hypothetical person had a residual functional capacity (RFC) to perform unskilled, sedentary work activity, and was limited by the following: could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs; could never work on unstable surfaces; could occasionally stoop, kneel, crouch, or crawl; and could never work at unprotected heights or in extreme temperatures.

Responding to the ALJ's hypothetical, Gianforte testified that Coleman could perform sedentary work as a hand packer, sorter, or examiner, of which there were approximately 6,500 jobs in the regional economy. Gianforte further testified that

literacy in English was not required to perform these jobs, but that she would recommend a clerical position for someone who relies on a cane to ambulate. According to Gianforte, 4,500 such clerical jobs existed in the regional economy, most of which could be performed at a fourth-grade level.

Following the five sequential steps laid out in 20 C.F.R. § 416.920, the ALJ found (1) Coleman had not performed disqualifying work since he applied for SSI in November 1999; (2) the medical evidence established that he had a severe impairment due to substance abuse, education limitations, asthma, and the gunshot wound in his leg; (3) the impairments—separately or in combination—did not meet a listed impairment under 20 C.F.R. § 404; (4) Coleman had no past relevant work; and (5) he could perform a significant number of jobs in the regional economy, such as sedentary clerical work. Thus, the ALJ concluded that Coleman was "not disabled."

After the Appeals Council denied Coleman's second request for review, the Commissioner's decision became final, *see Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005), and Coleman appealed to the district court for judicial review. The district court, affirming the ALJ's determination, granted summary judgment to the government.

## Analysis

We review the district court's grant of summary judgment de novo, but deferentially review the ALJ's decision to determine whether it is supported by substantial evidence. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotations and citations omitted). When reviewing for substantial evidence, we do not displace the ALJ's decision by reconsidering evidence or making credibility determinations. *Id.*

Coleman first argues that the ALJ failed to incorporate all of his relevant limitations in the hypothetical posited to Gianforte, the vocational expert. In particular, Coleman claims that the ALJ failed to mention to Gianforte that he could not stand or walk for longer than two hours in a workday and mistakenly informed Gianforte that he could occasionally kneel, crouch, or crawl when in fact he could never do so. Hypothetical questions posed to vocational experts ordinarily must include all limitations supported by medical evidence in the record. *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). However, an incomplete hypothetical may be cured and the

omitted limitations imputed to the vocational expert where the expert independently reviewed the record and was present during the hearing. *Id.*

Here, Gianforte testified that she had reviewed all relevant material in the exhibit file and was present throughout the hearing. And although the ALJ failed to include the limitation noted by Coleman, the knowledge may be imputed, as the district court found, by Gianforte's presence at the hearing and review of the record. *See Young*, 362 F.3d at 1003. Specifically, Gianforte was in fact present when Coleman testified that he could only stand for fifteen minutes at a time, and she presumably read Dr. Elmes's report declaring Coleman unable to stand or walk for longer than two hours in an eight-hour workday and determining that he could never kneel, crouch, or crawl. In addition, during the hypothetical the ALJ informed Gianforte that the person in question required a cane to ambulate farther than fifteen feet. Thus, in offering a single hypothetical with nearly all of Coleman's limitations included, the ALJ allowed Gianforte an opportunity to absorb all of the claimant's relevant limitations through a mixture of the hypothetical, the medical evidence in the record, and the hearing testimony. *Cf. Young*, 362 F.3d at 1003-05 (noting that knowledge of such limitations may be imputed but reversing because ALJ asked a series of confusing hypothetical questions).

Next, Coleman challenges the ALJ's RFC assessment as failing to include portions of Dr. Elmes's testimony supporting Coleman's claim. Coleman argues that the ALJ failed to build the "requisite logical bridge" from the evidence to her conclusions. Although it is true that an ALJ must "build a logical bridge," the ALJ need not provide "a complete written evaluation of every piece of testimony and evidence." *Haynes*, 416 F.3d at 626 (internal quotation marks and citations omitted).

Coleman's arguments on this point border on the frivolous. He contends that the ALJ's RFC assessment should have limited Coleman to lifting "less than" ten pounds rather than lifting "up to" ten pounds. Yet in finding that Coleman could lift "up to" ten pounds, the ALJ incorporated Dr. Elmes's opinion that Coleman had a lifting or carrying limitation of "less than" ten pounds. It is difficult to find a meaningful distinction between these terms that could be taken as a rejection of Dr. Elmes's opinion. Coleman further argues that the ALJ "found no limits in sitting" when making its RFC assessment. The ALJ's conclusion, however, explicitly mentioned that Coleman needed "normal breaks," could only stand or walk for "a combined total of less than two hours in a workday," and could not stand for longer than fifteen minutes at a time. Moreover, the ALJ's comprehensive decision made clear that it was based on "all the

evidence of record," including limitations on Coleman's sitting and standing ability described both in the medical record and at trial. Finally, Coleman's argument that Social Security Ruling 96-9p precludes him from working because he cannot lift ten pounds is contradicted by the ruling's own language, which allows for unskilled sedentary work if the claimant can lift or carry docket files, ledgers, or other small tools throughout the workday. *See* SSR 96-9p, 61 Fed. Reg. 34478, 34481 (July 2, 1996). Coleman himself admitted he could carry items such as a gallon of milk or a twelve pack of soda. Thus, the ALJ's lengthy and thorough decision built a logical bridge from the substantial evidence to its conclusion.

Coleman also contends that the ALJ violated Social Security Ruling 00-4p by failing to explore the inconsistencies between the vocational expert's testimony and the Dictionary of Occupational Titles (DOT). SSR 00-4p requires that an ALJ (1) ask the vocational expert if the evidence provided conflicts with the DOT and (2) if the evidence "appears to conflict" with the DOT, obtain a reasonable explanation for the apparent conflict. SSR 00-4p, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000). The ALJ bears the burden of making the necessary inquiry. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006).

Here, the ALJ asked the vocational expert, Gianforte, if the description of Coleman's past occupations conflicted with the DOT. However, the ALJ failed to do so when Gianforte discussed the requirements of jobs compatible with Coleman's limitations. This does not satisfy the ALJ's affirmative duty, under SSR 00-4p, to inquire about possible conflicts. *See Prochaska*, 454 F.3d at 735-36. If the ALJ had done so, she would have discovered that, at a minimum, Gianforte's testimony that the information clerk job could be performed by a person limited to the sedentary exertion level was inconsistent with the DOT's description of the job as requiring light exertion. *See* 4 U.S. DEP'T OF LABOR DICTIONARY OF OCCUPATIONAL TITLES 237.367-018 (4th ed. 1991).

The ALJ's error in failing to inquire about this conflict, however, was harmless. *See Prochaska*, 454 F.3d at 735-36 (using a harmless error standard). As the government points out, even excluding Gianforte's testimony that a person with Coleman's limitations could perform the jobs of information clerk and phone order taker, 8,000 other jobs remained available. Further, even subtracting all the industrial/manufacturing jobs and counting the only job consistent with the DOT—order clerk—1,500 jobs would still be available to a person with Coleman's limitations. We have held that 1,400 jobs falls within the parameters of a sufficiently significant occupational base. *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (citing cases holding that even fewer than 750 available positions amounts to a significant

occupational base).  The ALJ's failure to comply with SSR 00-4p was therefore harmless as, at the very least, a significant number of jobs cited by the ALJ and not inconsistent with the DOT remained available to Coleman.

Coleman next argues that the ALJ did not properly analyze his functional reading level.  This argument is belied by the ALJ's extensive and lengthy discussion of Coleman's literacy and education levels.  The ALJ's findings were based on substantial evidence in the record, including school records showing that Coleman graduated from the eighth grade with satisfactory marks, two written driving tests taken and passed by Coleman, disability forms filled out by Coleman, and Dr. Hilger's report questioning Coleman's effort and credibility.  Thus, Coleman's argument that the ALJ erred in analyzing his education level fails.

Coleman also contends that the ALJ erred at step three of the sequential analysis by misapplying Listing 1.02A.  Step three, which involves comparing evidence demonstrating a claimant's impairment with a "list of impairments presumed severe enough to preclude any gainful work," *Rice v. Barnhart*, 384 F.3d 363, 365 (7th Cir. 2004), requires that the claimant meet "*all* of the specified medical criteria," *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).  Coleman bears the burden of showing that his impairment meets the listing.  *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).  Listing 1.02A provides that an individual must demonstrate (1) a gross anatomical joint deformity, (2) chronic joint pain and stiffness or other limitation in motion, (3) medical imaging documenting the abnormality, and (4) an "inability to ambulate effectively."  20 C.F.R. pt. 404P, § 1.02A.  The fourth requirement of 1.02A, an inability to ambulate effectively, is defined as an extreme limitation of the ability to walk that interferes very seriously with an individual's ability to initiate, sustain, or complete activities.  *Id.* § 1.00B2b(1).  The definition goes on to explain that 'ineffective ambulation' requires a limitation so serious that it does not permit ambulation without the use of a hand-held assistance device limiting the use of both upper extremities.  *Id.* Examples include a walker, two crutches, two canes, or an inability to walk a block at a reasonable pace on rough or uneven surfaces.  *Id.* § 1.00B2b(2).

The ALJ applied the correct legal standard, and the finding that Coleman did not meet Listing 1.02A was supported by substantial evidence.  Although Coleman focuses his argument on whether the ALJ improperly narrowed the legal requirements for Listing 1.02A by requiring the use of hand-held devices in both hands, the ALJ's analysis in fact addressed all aspects of the listing.  The ALJ noted that Coleman used only one cane to ambulate, rather than the two canes required by the listing, and at

times did not use a cane at all. The record, for instance, shows that he did not use any assistance device while incarcerated in 2003, nor when he left the facility. Further, the ALJ considered Dr. Elmes's assertion that Coleman could occasionally climb ramps and stairs, and pointed out that Coleman was able to accomplish daily tasks, including acquiring alcohol and street drugs. Coleman cited no evidence whatsoever, other than his own blanket assertion, that he required more than one cane or could not walk a block at a reasonable pace. As such, Coleman failed to meet his burden in proving that his impairment satisfied all requirements within Listing 1.02A.

Finally, Coleman challenges the ALJ's credibility determination concerning his complaints of significant pain and stiffness in his right leg. In particular, he argues that the ALJ ignored Dr. Elmes's report in finding his testimony "not well-supported by the objective evidence." We afford an ALJ's credibility finding "considerable deference" and will only overturn it if "patently wrong." *Prochaska*, 454 F.3d at 738.

The ALJ properly took into account the objective medical findings in making its credibility assessment. In fact, the ALJ referred to Dr. Elmes's examination several times, and its decision offered a detailed discussion of Coleman's various symptoms. Ultimately, however, the ALJ was unpersuaded by Coleman's claims of pain as he went for several years at a time without treatment, failed to complain of leg pain when treated for other problems, and never sought prescription strength pain medicine. *See Johnson v. Barnhart*, 449 F.3d 804, 806-07 (7th Cir. 2006) (holding that ALJ has "solid grounds" for disbelieving a claimant who fails to receive active treatment or therapy, or use prescription pain medicine). The ALJ's credibility determination, which considered the entire record and took into account numerous factors, is therefore not so "patently wrong" as to require reversal.

## Conclusion

For the foregoing reasons, we AFFIRM the denial of Social Security benefits.