NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 21, 2021[*]
Decided June 22, 2021

**Before**

DIANE S. SYKES, *Chief Judge*

KENNETH F. RIPPLE, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 20-2597

| | |
|---|---|
| JENNIFER L. CHAMBERS,<br>    *Plaintiff-Appellant*,<br><br>    *v.*<br><br>ANDREW M. SAUL,<br>Commissioner of Social Security,<br>    *Defendant-Appellee*. | Appeal from the United States District<br>Court for the Western District of<br>Wisconsin.<br><br>No. 3:19-cv-00780-bbc<br><br>**Barbara B. Crabb**,<br>*Judge*. |

## O R D E R

Jennifer Chambers applied for Social Security disability insurance benefits and supplemental security income based on a variety of physical and mental health impairments, including depression, anxiety disorder, and post-traumatic stress disorder. An administrative law judge (ALJ) denied the applications on the ground that, despite severe mental and physical impairments, Ms. Chambers retained the residual

---

[*] We granted the parties' joint motion to waive oral argument for this case, agreeing that this appeal could be resolved on the briefs and record and that oral argument would not significantly aid the decisional process. Fed. R. App. P. 34(f).

functional capacity to perform simple, routine tasks in a low-stress environment, with only infrequent changes to work routine, occasional interaction with coworkers, and limited contact with the general public. The district court upheld that decision.

On appeal, Ms. Chambers narrows her arguments. She argues that the ALJ erred in considering the severity of her mental impairments and in weighing the conflicting medical and non-medical opinions concerning her condition. As with many Social Security disability cases that we see on judicial review, conflicting evidence here could have supported reasonable decisions to grant benefits or to deny them. The ALJ's decision to deny benefits was supported by substantial evidence, so we affirm. The ALJ resolved conflicts in the evidence in reasonable ways. She explained sufficiently why she discounted the more restrictive opinions of Ms. Chambers' treating therapists.

I.      *Background*

        A.      *Ms. Chambers' Relevant Medical History*

Jennifer Chambers applied for disability insurance benefits and supplemental security income in July 2015, alleging that she became disabled on January 5, 2015, when she was twenty-six years old. Ms. Chambers claimed that she was unable to work because she suffered from post-traumatic stress disorder, severe depression, panic attacks, anxiety and sleep disorders, and paranoia.

From 2012 through 2018, Ms. Chambers sought regular psychiatric and psychotherapeutic care. Most notably, she attended weekly psychotherapy sessions with her treating therapist, social worker Amanda Kalisz. Ms. Chambers had a history of suicidal ideation and had twice been admitted to voluntary inpatient care—once in May 2012 and again in July 2013. In February 2015, Ms. Chambers reported to a physician assistant that she had been experiencing worsening symptoms of depression. But Ms. Chambers said that her medication was working, and the physician assistant did not identify any risk factors for suicide. From March 2015 through April 2016, Ms. Chambers continued to suffer from depression, anxiety, and difficulty sleeping. Her mental status examinations during this period indicated normal thought processes and content, good insight and judgment, and, on a few occasions, suicidal ideation.

In April 2016, Ms. Chambers took a Continuous Performance Test. Her results were within the normal range on all indices, and the administering psychologist found that she had "no apparent problems with focusing her attention, sustaining that focus or problems with impulsivity." The results indicated, however, that Ms. Chambers

lacked ego development and strength and that she showed a strong need for support and attention. The psychologist recommended counseling to help her develop a sense of self and coping skills.

From August 2016 through August 2017, Ms. Chambers continued to see Ms. Kalisz, other therapists, physicians, and physician assistants for regular psychiatric and psychotherapeutic care, pre-natal and post-natal care, and medication management. In July and August 2017, Ms. Chambers reported thoughts of self-harm and worsening depression, but she was neither admitted nor sought admittance to a hospital.[1] Throughout September 2017, however, Ms. Kalisz and other healthcare providers found that Ms. Chambers exhibited normal thought processes and content, mostly good insight and judgment, and no suicidal, homicidal, or paranoid ideation. In October 2017, Ms. Chambers discussed her ongoing anxiety with multiple therapists. The discussions involved "themes of safety," encouraging her to pursue positive self-talk and release of anxious energy through meditation and exercise.

In November 2017, Ms. Chambers' treating psychiatrist, Dr. James Lean, found that she exhibited normal thought processes and content, good insight and judgment, and no suicidal ideation. In January 2018, Ms. Chambers said that she was "less agitated, less frustrated, more laid back, [and] more ambitious" since starting a new medication, Lamictal. At follow-up visits in March, May, and July 2018, Ms. Chambers repeated these positive developments. Dr. Lean's mental status examinations during these visits indicated that Ms. Chambers had normal thought processes and content and good insight and judgment and that she was calmer and alert. Mental status examinations performed by Ms. Kalisz from June through September 2018 also reflected that Ms. Chambers had normal thought content and processes, normal mood and affect, and no psychosis.

B.      *State Agency Assessments and Administrative Proceedings*

In September 2015, state agency psychologist Beth Jennings, Ph.D., assessed Ms. Chambers' residual functional capacity. She found that Ms. Chambers was not

---

[1] Ms. Chambers' treating physician assistant identified several "suicide protective factors," including "responsibility for children, duty to others, supportive [significant] other, fear of death/pain, pets, religious prohibition, help-seeking behaviors, restricted access to lethal means, engagement in ongoing mental health care, willingness to engage in treatment." During a July 2017 appointment, Ms. Chambers agreed to a "contract" with the physician assistant that if she had any thoughts of harming herself or others, she would immediately report to a hospital emergency room. She renewed this commitment in later appointments.

significantly limited in remembering very short and simple instructions, maintaining regular attendance, and making simple work-related decisions. Dr. Jennings opined that Ms. Chambers would perform better in jobs that did not require extended time around peers. Dr. Jennings also opined that "periodic exacerbations" of mental health symptoms might limit Ms. Chambers' capacity to perform work at a consistent pace.

In December 2015, state agency psychologist John Warren, Ed.D., reassessed Ms. Chambers' residual functional capacity. He also opined that Ms. Chambers was not significantly limited in carrying out very short and simple instructions and maintaining regular attendance, but found that she was moderately limited in getting along with co-workers.

At her hearing before the ALJ in August 2018, Ms. Chambers, then twenty-nine years old, described her family, personal relationships, daily schedule, and work history. She had an eighteen-month-old son and a nine-year-old daughter with developmental and cognitive disabilities. Ms. Chambers also testified that she was going through a divorce and that she and her children had recently moved in with her physically disabled mother. Ms. Chambers clarified, however, that she was looking for her own apartment.

Ms. Chambers testified that on a typical day, she cared for her children and dog, cleaned the house, managed her medications and appointments, and spent a few hours on Facebook. Three days a week, she worked part-time as a grocery store cleaner, between twelve and sixteen hours per week. Before her alleged disability onset date, she had done full- and part-time work in manufacturing, cashiering, and cleaning.

A vocational expert also testified at the hearing. The ALJ asked about jobs that could be done by a person who was a high-school-educated, twenty-nine-year-old with no relevant past work, capable of performing medium work consisting of simple tasks in a low-stress environment with only infrequent changes to routine, occasional interaction with co-workers, and incidental interaction with the public. The expert opined that such a person could work as an industrial cleaner, a laundry laborer, and a stuffer.[2]

The ALJ applied the familiar five-step analysis for assessing disability and concluded that Ms. Chambers was not disabled. See 20 C.F.R. §§ 404.1520(a)(4),

---

[2] "Stuffer" is defined as "bulk sausage stuffing machine operator." U.S. Dep't of Labor, *Dictionary of Occupational Titles* § 520.685-210 (4th ed. 1991) (cleaned up).

416.920(a)(4). At step one, the ALJ found that Ms. Chambers had not engaged in any substantial gainful activity since her alleged disability onset date. At step two, the ALJ identified her severe mental impairments as depression, anxiety, post-traumatic stress disorder, and personality disorder.

At step three, the ALJ concluded that these impairments, individually or in combination, did not satisfy a listing for presumptive disability. In interacting with others, the ALJ determined, Ms. Chambers had no more than a moderate limitation. She regularly drove her children to school and the public swimming pool, went grocery shopping, attended doctor's appointments, and spent time with family, friends, and her partner. The ALJ also cited Ms. Chambers' mental status examinations, which generally described her as presenting with intact "memory, attention, and concentration without mention of difficulties cooperating or completing examinations." With respect to adapting and managing herself, the ALJ found that Ms. Chambers was independent and effective and had no limitations.

In determining Ms. Chambers' residual functional capacity, the ALJ found that the objective medical evidence, including Ms. Chambers' normal results on her Continuous Performance Test and "mostly unremarkable" mental status examinations, was inconsistent with her allegations of disability. While recognizing that Ms. Chambers' psychological symptoms fluctuated in severity, the ALJ emphasized that periods of worsening symptoms were temporary and coincided with "significant life stressors," such as her daughter's diagnosis, issues related to her husband's alcoholism and their impending divorce, her mother's overdose on prescription medication, and her grandmother's death. The ALJ further noted the blunting effects of proper medication and regular psychotherapy sessions on Ms. Chambers' symptoms.

The ALJ also considered and assigned weight to the opinions of the two state agency psychologists and Ms. Chambers' treating therapist, Ms. Kalisz, and treating psychiatrist, Dr. Lean. Most relevant, while the ALJ did not adopt all the state agency psychologists' respective opinions, she found them consistent with the finding that Ms. Chambers could perform unskilled work with limited social interaction and limited changes in work routine.

Critical for this appeal, the ALJ also explained why she gave little weight to the opinions of Ms. Kalisz and Dr. Lean that would, if credited, support a finding that Ms. Chambers was disabled within the meaning of the Social Security Act. The ALJ discounted Ms. Kalisz's opinions that Ms. Chambers was incapable of even low stress work and was extremely limited in her daily life, social functioning, maintaining

concentration and pace, and getting along with peers. The ALJ noted that the records of Ms. Kalisz's own mental status examinations of Ms. Chambers—which were generally normal with intact cognition—indicated otherwise.

The ALJ similarly discounted Dr. Lean's opinion that Ms. Chambers' social and mental limits rendered her incapable of completing a full workday. In particular, the ALJ discounted Dr. Lean's finding that Ms. Chambers had "a history of more than one year of an inability to function outside a highly supportive living environment." The ALJ emphasized that Ms. Chambers had been caring for her children since her alleged disability onset date. The ALJ further disagreed with the respective opinions of both Ms. Kalisz and Dr. Lean that Ms. Chambers had suffered four or more episodes of decompensation within a twelve-month period. The preponderance of the medical evidence, the ALJ reasoned, simply did not support such restrictive opinions.

At step four, the ALJ concluded that Ms. Chambers had no past relevant work. At step five, relying on the vocational expert's testimony, the ALJ found that Ms. Chambers could perform a number of unskilled jobs in the national economy, such as industrial cleaner, laundry laborer, and stuffer. The ALJ therefore found that Ms. Chambers was not disabled. The Appeals Council denied review. Ms. Chambers then sought review in the district court, which upheld the ALJ's decision.

On appeal to this court, Ms. Chambers contends that the ALJ failed to assess and weigh properly the opinions of the state agency psychologists and the opinions of her treating therapists, Ms. Kalisz and Dr. Lean. She also argues that the ALJ "played doctor" by making findings about her mental health impairments that were not supported by these opinions.

II.     *Discussion*

We will uphold an ALJ's decision if it is supported by substantial evidence. See 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019). Our review is deferential: we will not reweigh the evidence, resolve conflicts in the record, decide questions of credibility, or substitute our judgment for that of the ALJ. *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017); *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). We will, however, "examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions" that gives us a sufficient basis to "assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Here, the ALJ's decision is supported by substantial evidence and built the needed "logical bridge." The balance of the objective medical evidence, opinion evidence, and Ms. Chambers' own testimony detailing her daily activities support the ALJ's determination that Ms. Chambers could perform medium work consisting of simple, routine tasks in a low-stress environment, with only occasional interactions with peers and incidental interactions with the public.

First, the ALJ appropriately considered the objective medical evidence in the record in reaching her findings. 20 C.F.R. §§ 404.1529(a), 416.929(a). Notably, Ms. Chambers' mental status examinations during the relevant period—particularly after September 2015—were mostly unremarkable with regard to her thought content and processes, cognition, and insight and judgment. Her 2016 Continuous Performance Test yielded normal results on all indices. Her claims of worsening symptoms were temporary and corresponded to periods of significant stress.[3]

Further, as the ALJ noted, Ms. Chambers' treatment history was "relatively conservative" and did not support Ms. Kalisz's and Dr. Lean's respective opinions that Ms. Chambers had suffered four episodes or more of decompensation within a twelve-month period. Medical opinions may be discounted if they are inconsistent with the record as a whole, and Dr. Lean's opinion that Ms. Chambers suffered multiple episodes of decompensation was inconsistent with the treatment record. See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4); cf. *Knight v. Chater*, 55 F.3d 309, 313–14 (7th Cir. 1995) ("The ALJ must give substantial weight to the medical evidence and opinions submitted, unless specific, legitimate reasons constituting good cause are shown for rejecting it."). Ms. Chambers' medical records revealed fluctuating psychological symptoms, but her mental impairments never deteriorated to the point of disabling her within the meaning of the Social Security Act, which requires complete disability for not less than twelve months. See 42 U.S.C. § 416(i). For example, in July and August 2017, when Ms. Chambers reported thoughts of self-harm and worsening depression, she was neither prescribed a significantly more aggressive treatment plan nor admitted to a hospital. And by January 2018, following adjustments to her medications, she reported

---

[3] Ms. Chambers also reported that her symptoms worsened whenever she decreased or ceased taking medications. Symptoms that abated once she resumed medication were not disabling. E.g., *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (rejecting claimant's argument that sleeping disorder prevented her from working where claimant testified that "medication kept it under control").

feeling less agitated, more relaxed, more ambitious, and better overall. These positive developments continued through July 2018.

Second, Ms. Chambers' own description of her daily activities conflicted with Ms. Kalisz's opinion that she was incapable of even low stress work and Dr. Lean's medical opinion that she was "markedly limited in activities of daily living" and unable to complete a full workday. Ms. Chambers testified that she cared for her two children and dog, performed household chores, and managed her medications and appointments. She also went grocery shopping, drove her children to school and the public pool, spent time with family, friends, and her partner, and even attended larger gatherings such as family weddings and birthday parties. We and other courts have often cautioned against unrealistic and exaggerated reliance upon such evidence of daily activities to determine a person's ability to engage in full-time employment. See, e.g., *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (collecting cases). Such evidence of daily activities is relevant, however, and it can be helpful in evaluating conflicting evidence about a person's limitations. Given our deferential standard of review, we do not see anything unreasonable in the ALJ's consideration of the evidence of Ms. Chambers' activities of daily living in this case.

Additionally, the level of independence and effectiveness shown by Ms. Chambers in her daily activities belied Dr. Lean's opinion that she had a "history of more than one year of an inability to function outside a highly supportive living environment." As of the hearing in August 2018, Ms. Chambers was living with her disabled mother and was the primary caregiver for her two children. The ALJ did not err by discounting Dr. Lean's opinion because it was controverted by both the objective medical evidence and Ms. Chambers' own testimony.

Accordingly, the judgment of the district court affirming the denial of disability insurance benefits and supplemental security income is AFFIRMED.