**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 3, 2020
Decided March 10, 2020

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 19-2028

| | |
|---|---|
| HARRY E. MORRISON, JR., | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of Indiana, |
| | South Bend Division. |
| *v.* | |
| | No. 3:17 CV 914 MGG |
| ANDREW M. SAUL, | |
| Commissioner of Social Security, | Michael G. Gotsch, Sr., |
| *Defendant-Appellee.* | *Magistrate Judge.* |

## O R D E R

Harry Morrison, Jr., challenges the denial of his application for disability insurance benefits. He argues that the administrative law judge ("ALJ") erred by failing to adequately account for his moderate limitations in concentration, persistence, and pace, and by erroneously discrediting his testimony about his limitations. The district court upheld the ALJ's decision. Because substantial evidence supports the ALJ's decision, we affirm the district court's judgment.

## I. Background

In 2014, Morrison, now 59 years old, applied for disability insurance benefits based on depression, anxiety, back problems, and asthma.

### A. Mental Impairments

Morrison has had chronic depression since at least 2005, when his first wife died. His doctor prescribed antidepressants, but Morrison stopped taking them in late 2012 because he could no longer afford the medication. In early 2013, he experienced suicidal ideations and was admitted to the hospital, where he "rapidly restabiliz[ed]" with treatment. As later chart notes indicate, Morrison "continue[d] to struggle with depression and anxiety." In mid-2016, his primary care doctor noted that Morrison "really needs to follow up with psychiatry …. [but] does not have health insurance."

Three agency psychologists opined on Morrison's mental impairments in 2014. An examining psychologist diagnosed Morrison with "Major Depression, Moderate, Recurrent" and noted that he appeared "highly anxious" with poor attention and concentration. Still, the doctor concluded, Morrison had good social skills and would be able to learn new vocational skills, understand and follow instructions, and perform "simple repetitive acts if they did not exacerbate [his] pain." Based on a review of Morrison's medical records, two consulting psychologists opined that his attention and concentration were "moderately impacted but appear reasonable for simple, repetitive tasks," and that he could attend to such tasks "for sufficient periods of time."

In 2015, Morrison requested a referral to Dr. John Kelly, who, unlike his primary doctor, completes evaluations for disability applicants. In assessing Morrison's abilities to do work-related activities in light of his mental impairments, Dr. Kelly opined, in August 2016, that Morrison is so distracted by pain that he "forgets simple tasks in the home regularly," "cannot function independently," and "cannot maintain attention and concentration sufficiently to do any job."

### B. Physical Impairments

The record reflects a long history of back problems. By 2005, Morrison had undergone three surgeries to address degenerative disc disease of his lumbar spine. In 2015, his doctor referred him to a neurosurgeon, a physical therapist, and a pain management specialist, but Morrison did not follow up on any of these referrals.

Morrison also has a history of heart and lung conditions. In his mid-thirties, he had a stent placed in a coronary artery following a suspected heart attack. A smoker for many years, Morrison uses an inhaler and home nebulizer for his asthma and chronic obstructive pulmonary disease ("COPD"). In 2016, he was hospitalized for, among other things, exacerbation of his COPD, coronary artery disease, and an abnormal heart rhythm. He received a defibrillator implant, which resolved his heart palpitations, although the device has twice needed adjustments.

Dr. Kelly also assessed Morrison's physical capabilities in August 2016, opining that, due to back pain, Morrison could stand for only 15 minutes at a time, up to two hours per day, and sit for 20 minutes at a time, for a total of two to three hours per day. He also opined that Morrison would need to lie down during the day and, because of his heart conditions, could lift no more than five pounds.

## C. Administrative Proceedings

At a video hearing before the ALJ in 2017, Morrison testified about his work history. He stated that, for 28 years, he was employed as a machinist for the same company, working six days a week and "a lot of overtime." He returned to work after each of his three back surgeries. Yet, by 2012, he was unable to continue working due to pain, so his employer let him take "voluntary layoff." (On a 2014 disability form, however, Morrison wrote that he stopped working because "the company relocated.") Morrison looked for another job because he was "desperate," but testified that he does not think he could have worked.

Morrison described how his impairments affect his daily activities. He testified that he "cannot sit or stand for a long period of time" due to back pain, so "most of the time" he lies in bed watching television. He testified that he can carry about 10 pounds, stand continuously for 10 or 15 minutes, and walk two or three blocks at a time. He stated that he drives to the store or doctor about once a week; dines out about once a month; and helps with light chores, like dishwashing, but only "in spurts" because of pain. He also testified that he gets winded when dressing and uses his nebulizer every four hours. As for his mental impairments, Morrison said that his medications help "some," but he is "always very depressed" and experiences weekly crying spells.

The ALJ questioned Morrison about his failure to follow up on his primary care doctor's referrals to specialists. Morrison testified that he tried to see the pain management specialist, but that doctor "went out of business" before his appointment,

and then Morrison lost his health insurance. He could not recall why he did not meet with a physical therapist or a neurosurgeon, but said that "most of the time" when he did not seek care, "it was for money reasons." Even when he was on his wife's insurance, Morrison said, costs were high due to poor coverage and a "very large deductible." Further, that plan did not cover mental health services, so Morrison did not seek treatment for his depression, as recommended. The ALJ asked why he was not taking advantage of "free services available in the Valparaiso [Indiana] area"; Morrison replied that he did not know of any such services because he is from a different town.

A psychological expert, Dr. Ellen Rozenfeld, testified next. Based on her review of the record, she opined that Morrison has major depressive disorder and anxiety, but that both conditions are "well controlled" with medication. She noted that, on a March 2014 form, Morrison's wife did not check the boxes corresponding to observed deficits in concentration, memory, task completion, or ability to understand and follow instructions—although she noted elsewhere her husband's "short attention span" and problems with handling stress. Dr. Rozenfeld then opined that Morrison has moderate limitations in adaptation and in concentration, persistence, and pace, and is "mentally capable of understanding remembering, and carrying out detailed instructions"—with "detailed" meaning "one to five-step instructions." In so concluding, she did not rely on Dr. Kelly's opinion noting more extreme limitations because he did not provide any basis for his conclusions. She also did not consider pain in assessing Morrison's mental functions but acknowledged that pain could "contribute to other limitations."

The ALJ then asked a vocational expert ("VE") whether jobs exist in the national economy for a person of Morrison's age, education, and work experience. The hypothetical claimant could sit six to eight hours, stand and walk at least six hours, frequently carry up to 10 pounds, and occasionally carry up to 20 pounds, with certain postural and environmental restrictions. The claimant was further limited to "jobs that are simple and detailed, one to five-step instructions only." The VE opined that this claimant could not do Morrison's past job but could perform unskilled or semiskilled "light work" as a cutting, punching and pressing operator/tender, and as a packing and filling machine operator/tender. Limiting him to "simple, repetitive tasks" would eliminate the semiskilled jobs. Yet, the VE opined, the claimant could not perform those jobs at any skill level if he "had to have a sit/stand option every 20 to 30 minutes," and would be off-task three to five minutes while standing.

Applying the standard five-step analysis, *see* 20 C.F.R. § 404.1520(a)(4), the ALJ concluded that Morrison was not disabled. The ALJ found that he has severe

impairments of lumbar degenerative disc disease, cardiomyopathy, coronary artery disease, chronic heart failure, COPD, obesity, major depressive disorder, and anxiety—but that no impairment meets the criteria for a presumptively disabling condition. The ALJ then determined that Morrison has the residual functional capacity to perform "light work" (with certain postural and environmental restrictions not relevant here) and could perform jobs involving "simple and detailed, one-to-five step instructions only." By definition, "light work" requires "a good deal of walking or standing" or "sitting most of the time." 20 C.F.R. § 404.1567(b). Based on this residual functional capacity and the VE's testimony, the ALJ concluded, Morrison was capable of doing jobs available in the national economy.

In assessing Morrison's physical capabilities, the ALJ gave "great weight" to the opinion of the agency's consultants, who opined that Morrison could sit, stand, or walk for "about" six hours in a workday. The ALJ gave "little weight" to Dr. Kelly's opinion that Morrison was more restricted, reasoning that Dr. Kelly examined Morrison on only "one occasion," and only to complete disability paperwork. As for Morrison's mental functioning, the ALJ remarked that the limitation to "performing simple and detailed, one to five step instructions is supported by [his] depressive disorder and moderate difficulties in concentrating, persisting or maintaining pace." In so concluding, the ALJ gave "significant weight" to Dr. Rozenfeld's opinion because it was "based on and consistent with the totality of the record." The ALJ gave "great weight" to the agency consultants' opinion that Morrison can attend to "simple, repetitive tasks" for "sufficient periods of time." She again gave "little weight" to Dr. Kelly's opinion, adding that mental evaluations are not within his medical expertise.

The ALJ declined to impose more restrictive work-related limitations, including "sit-stand options," because she found Morrison's statements about the intensity and limiting effects of his symptoms "not entirely consistent" with his admitted activities and the medical evidence. The ALJ found that Morrison is able to perform a "wide range of independent activities of daily living"—e.g., preparing simple meals, visiting with family, shopping, watching television, and driving a car—and that these activities require "significant physical and mental demands, which are not consistent with the level of limitation [he] allege[d]." The ALJ also discounted Morrison's self-reported limitations because he received only "routine and conservative treatment" since his last back surgery; he returned to work after these surgeries, "which strongly suggest[s] that [his impairments] would not currently prevent work activity"; the record shows that he stopped working because of a "business/economical lay off" when the company relocated; and he looked for other work after his layoff, indicating that he "stopped

working for reasons not related to any specific medical condition." Further, Morrison did not seek "no-cost treatment alternatives," suggesting he may not be "truly impoverished to the extent alleged," and he followed up on referrals only when it was "beneficial for completion of disability documents." To the ALJ, these facts indicated that Morrison was unwilling to seek the help he needed or that his symptoms were "not as severe as he purports."

The Appeals Council denied Morrison's request for review, and the district court upheld the ALJ's decision.

## II. Analysis

We review the district court's decision de novo and, thus, review the ALJ's decision directly. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017). We will uphold that decision if it is supported by "substantial evidence" in the record. *Id.*

### A. Concentration, Persistence, and Pace

Morrison primarily argues that the ALJ erred because neither the written discussion of his work-related capabilities nor the hypothetical questions posed to the VE accounted for his "moderate" limitations in concentration, persistence, and pace. The argument is poorly developed, but Morrison appears to contend that (1) the ALJ did not include *any* limitations "related to concentration, persistence, or pace," and (2) limiting him to "simple and detailed, one-to-five step instructions only" does not adequately account for his deficiencies in these areas. Both arguments are unavailing.

First, the ALJ *did* include restrictions related to decreased concentration, persistence, and pace. To the extent that Morrison would require specific phrasing, we have rejected that approach. *See Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (noting that "there is no magic words requirement"). The ALJ need not use the specific words "concentration, persistence, and pace," so long as she accounts for all the limitations she identifies. *Id.*; *see also O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).

Second, limiting Morrison to jobs involving "simple and detailed, one-to-five step instructions only" adequately accounted for the only deficits in concentration, persistence, and pace that the ALJ found supported by the record. Morrison argues that the phrase "simple and detailed" is incoherent because "instructions cannot be both at the same time." In context, however, the ALJ clearly meant that Morrison could perform

both simple instructions *and* detailed instructions, with "detailed" referring to "one to five-step instructions." The ALJ drew this restriction from the opinion of the medical expert, Dr. Rozenfeld, which is a permissible way of "translating" medical evidence into work-related restrictions. *See Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019).

Morrison contends that Dr. Rozenfeld's assessment of his abilities is flawed because she did not consider his chronic pain, which, he says, made his limitations in concentration, persistence, and pace "much worse." Yet he cites no evidence to support this assertion. Nor does he offer any additional restrictions that he believes should have been included in the RFC—either in his brief or at oral argument, when his counsel was specifically given the opportunity to do so. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (ruling any error in RFC was harmless because claimant cited no evidence of greater limitations nor hypothesized any additional work restrictions).

### B. Credibility Assessment

Morrison also challenges the ALJ's adverse credibility determination. "Because the ALJ is 'in the best position to determine a witness's truthfulness,'" we will not overturn an ALJ's credibility determination unless it is "patently wrong." *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012) (quoting *Skarbek v. Barnhart,* 390 F.3d 500, 504–05 (7th Cir. 2004)). The ALJ's determination here does not rise to that level.

Morrison first argues that the ALJ drew improper inferences from his failure to seek out free or low-cost medical care. Before drawing negative inferences about a claimant's symptoms from a failure to pursue treatment, an ALJ first must consider the claimant's explanations for that failure. *See Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013). Here, the ALJ did so, asking Morrison why he did not follow up on referrals for psychiatry, pain management, and neurosurgery. She then considered his explanation (that he could not afford the services due to poor or no insurance) but ultimately rejected it. She did so *in part* because Morrison did not seek out lower-cost options. This was not the only reason, however; the ALJ also noted that, despite his finances and lack of insurance, Morrison still was able to follow up with the referral necessary to complete his disability application. The ALJ pointed to specific findings and evidence to support her credibility determination, so it is not our place to second-guess it. *See Murphy v. Colvin*, 759 F.3d 811, 815–16 (7th Cir. 2014), *as amended* (Aug. 20, 2014) (noting credibility determination is patently wrong if it "lacks any explanation or support").

Morrison next argues that the ALJ "overemphasized" his daily activities because she "missed" the fact that his activities were performed at his own pace, mostly in his home. Morrison does not flesh out this argument, but instead simply cites *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012), in which we lamented the failure of many ALJs to recognize the "critical differences between activities of daily living and activities in a full-time job." However, the ALJ here did not equate Morrison's activities of daily living with an ability to work full-time. Rather, she found that his admitted activities were not entirely consistent with the level of limitation that he alleged. In assessing the weight to give Morrison's testimony, the ALJ considered other factors, as well (such as the fact that he had received only conservative treatment for back pain since his last surgery). As we have said, "it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether 'testimony about the effects of his impairments was credible or exaggerated.'" *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (quoting *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016)).

Finally, Morrison argues that the ALJ erred by failing to properly consider his "consistent and arduous work history," including the fact that he returned to work after a heart attack and three back surgeries. Although a good work record ordinarily weighs in favor of a positive credibility finding, *see Summers v. Berryhill*, 864 F.3d 523, 529 (7th Cir. 2017), the ALJ gave adequate reasons for concluding otherwise in this particular case. In the ALJ's view, returning to work after each of three back surgeries—and then looking for work after being laid off—"strongly" suggests that Morrison's impairments were not disabling. She also noted that Morrison reportedly lost his job when the company relocated, showing that he stopped working for reasons unrelated to his health. The ALJ adequately explained her credibility determination, so we defer to it.

AFFIRMED