**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 7, 2019
Decided August 23, 2019

**Before**

DANIEL A. MANION, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 19-1079

| | |
|---|---|
| JOHN N. PALMER,<br>    *Plaintiff-Appellant,* | Appeal from the United States District<br>Court for the Central District of Illinois. |
| *v.* | No. 17-cv-3304 |
| ANDREW M. SAUL,<br>Commissioner of Social Security,<br>    *Defendant-Appellee.* | Tom Schanzle-Haskins,<br>*Magistrate Judge.* |

**O R D E R**

John Palmer applied for Social Security Disability Insurance Benefits, asserting that his diabetes and the aftereffects of a heart attack have so impaired him that he is no longer able to work. He complains of pain, fatigue, numbness, and concentration problems. After a hearing, an administrative law judge concluded that Palmer was not disabled—a conclusion upheld by the district court. Because substantial evidence supports the ALJ's ruling, we affirm.

**Background**

John Palmer is a 47-year-old former forklift operator who was laid off in 2012 and has not worked since. He suffers from heart disease, diabetic peripheral neuropathy, hypertension, and obesity. He applied for disability benefits, alleging an onset date in August 2013.

Palmer's difficulties stem primarily from his peripheral neuropathy—basically, nerve damage—which has manifested most acutely as pain and numbness in his lower legs and feet (though he alleges numbness in his hands as well). Palmer visited neurologist Rana Mahmood in 2012 and reported tingling and numbness in his lower extremities. Soon after—it is not clear from the record exactly when—Palmer's neuropathy was diagnosed as diabetes-related.

Palmer's complaints of pain and numbness continued for years. Palmer told one of his primary care physicians,[1] Dr. Alan Bilyeu, in mid-2013 that he was in terrible pain, had difficulty walking, could not tell where his feet were, and could not tell whether things he touched with his feet were hot or cold. Early the next year Palmer reported to Dr. Thomas Bilyeu that he had pain in his feet and could barely walk. Soon after, Palmer completed the agency's Function Report form, which asks an applicant to explain how his conditions limited his activities. Palmer wrote that he had nerve pain, could not drive far or stand long, had no grip strength, and could not feel things with his hands or feet. During a 2016 meeting with Dr. Alison Bilyeu, Palmer reported continued numbness in his lower extremities and mentioned that he had fallen twice that week while walking. And a few months later, he complained of numbness to one of Dr. Alison Bilyeu's colleagues, Dr. Claude Fortin.

At his hearing before an ALJ in 2016, Palmer reiterated his complaints of pain and numbness. He complained that his legs went numb while sitting, forcing him at times to have to stand up, and that the pain caused by his neuropathy kept him awake at night despite medication. He said that he fell once every few months, that driving was difficult because he could not feel the pedals, and that the lack of feeling in his feet made him more likely to fall if he stepped on anything.

Though Palmer has coronary artery disease, it is not clear (and Palmer never explains) how that impairment affects him. Palmer had a heart attack in 2013 and

---

[1] Drs. Alan Bilyeu, Alison Bilyeu, and Thomas Bilyeu all treated Palmer.

underwent surgery. At a follow-up appointment, Palmer denied chest pain, and a cardiologist said that his coronary disease was "doing very well." A later echocardiogram and stress test revealed no complications, and in 2016, Dr. Fortin noted that Palmer had a regular heart rhythm, a normal cardiac silhouette, and no chest pain.

After Palmer filed his disability claim, several state agency physicians examined him; none concluded he was totally disabled. Dr. Vittal Chapa reported that Palmer had 5/5 strength in both hands and could perform both fine and gross manipulation, though he noted that Palmer had decreased pinprick sensation in his feet and lower legs. Dr. Richard Lee Smith opined that Palmer could occasionally lift 20 pounds and frequently lift 10 pounds, that he could stand or walk for six hours in an eight-hour workday, and that he could sit for six hours as well. Dr. Smith determined that Palmer could occasionally climb ramps and stairs as well as stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds, and should avoid exposure to hazards. And though Dr. Smith noted decreased sensation, he found good grip strength and movement of the fingers and no motor weakness or muscle atrophy. Dr. Bernard Stevens drew the same conclusions as Dr. Smith, adding that Palmer should avoid concentrated exposure to heat and cold.

Palmer offered his own assessment of his physical capabilities in the Function Report he filled out in 2014. In addition to the numbness-related problems described earlier in this order, Palmer reported having difficulty lifting more than twenty pounds, not being able to concentrate for long because of nerve pain, not being able to climb into a tree stand while hunting, and having to use a crossbow instead of a traditional bow. He also said that he could care for himself, complete several fifteen-minute tasks throughout the day (including laundry, making the bed, washing dishes, and sweeping), and go grocery shopping by car twice a week.

His testimony at his hearing in 2016 is generally consistent with his Function Report, with a few exceptions: at his hearing, Palmer added that he drove only once a week, no longer did any grocery shopping or food prep (though he sometimes made himself a sandwich), and no longer hunted or fished by himself. Palmer added that he fell every few months and was too tired to work a full eight-hour day because of poor sleep caused by his nerve pain.

At the close of Palmer's hearing, the ALJ asked a vocational expert whether competitive work existed for someone with the following limitations: light work; no ladders, ropes or scaffolds; occasional postural functions; alternation between standing

and sitting every thirty minutes; frequent manipulative functions; avoidance of hazards and concentrated exposure to irritants or humidity; and simple, repetitive tasks involving little or no change in work routine. The expert said that there were ample jobs available in the state and national economy for such a person, including "router," "parking attendant," and, if the person were further limited to sedentary work, "call out operator."

Following the five-step process for evaluating a claimant's application for disability benefits, 20 C.F.R. § 404.1520(a), the ALJ concluded that Palmer was not disabled. The ALJ found that Palmer had satisfied the first two steps, because he had not worked since his alleged disability onset date (step 1), and neuropathy, coronary artery disease, hypertension, and obesity were severe impairments (step 2). Because Palmer's impairments did not meet or equal any of those listed in the regulations (step 3), the ALJ evaluated Palmer's residual functional capacity and concluded that, though Palmer could not perform any of his past work (step 4), he was capable of light work, subject to the same limitations that the ALJ posed to the vocational expert in his hearing hypothetical (step 5).

After the Appeals Council denied review, a magistrate judge sitting by consent affirmed the ALJ's decision. The magistrate judge concluded that substantial evidence supported the ALJ's opinion and that the ALJ properly rejected each of Palmer's arguments—that the ALJ did not explain or support his RFC determination, that the ALJ failed to contact Palmer's physicians to clarify the extent of his impairments, that the ALJ should have resolved a discrepancy in one of the medical reports, that the ALJ's hypothetical to the expert was incomplete, and that the limitations imposed were not supported by the evidence.

## Analysis

On appeal, Palmer first argues that the ALJ failed to properly explain how he made his residual functional capacity determination. Specifically, Palmer asserts that the ALJ improperly omitted certain details about two of the state non-examining physicians (Drs. Smith and Stevens), including their names, specializations, the evidence they considered, and their rationales. Their findings, Palmer maintains, "differ from one another in important ways and from the ALJ's RFC determination."

This argument is unconvincing; what matters is whether the ALJ's residual functional capacity determination is supported by the record evidence. It is. In a five-

page narrative, the ALJ discussed, accurately and at length, Palmer's Function Report, his medical records, his hearing testimony, and the opinions of his treating and non-treating physicians. The ALJ did not err by leaving some details in the record undiscussed. *See Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). It is true that the ALJ said little about the state's non-examining physicians, but he did opine that their conclusions were consistent with the rest of the record, including the opinions of Palmer's primary care physicians. Significantly, the ALJ's RFC findings were more restrictive than the conclusions of those non-examining physicians, and Palmer does not explain how a more restrictive RFC could have negatively affected his claim.

Palmer next argues that the ALJ was required before issuing his opinion to contact Dr. Alison Bilyeu to clarify the effect of Palmer's neuropathy on his episodes of falling. He cites 20 C.F.R. § 404.1520b(c) (2012), a regulation in effect at the time, which addresses the manner in which the Social Security Administration is supposed to evaluate evidence. Palmer maintains that this regulation required the ALJ to recontact Dr. Bilyeu to obtain more information.

This argument is frivolous. The regulation says only that the agency "may" recontact a medical source, at its discretion. § 404.1520b(c)(1). Palmer has not presented—nor are we aware of—any regulation in force at the relevant time period that required ALJs to contact a medical source under any circumstance.

Palmer next argues, relatedly, that the ALJ failed to include all of Palmer's limitations—specifically, his episodes of falling—in the hypothetical posed to the expert for the purpose of providing a "complete picture" of his RFC. *Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011). This argument, too, lacks merit. True, a hypothetical posed to a vocational expert "must include all limitations supported by medical evidence in the record." *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). But as Palmer testified, his infrequent falls (once every few months) were caused by his inability to feel objects beneath his feet—the falls are not themselves limitations. Insofar as Palmer is arguing that the ALJ did not account for this underlying limitation, he is mistaken. The ALJ accounted for the effects of Palmer's neuropathy-induced numbness in the hypothetical posed to the expert by stipulating the need to avoid hazards and limiting climbing and postural activities.

Palmer next argues that the ALJ failed to resolve an inconsistency in Dr. Fortin's 2016 medical report, also in violation of 20 C.F.R. § 404.1520b—the regulation that explains how ALJs are supposed to evaluate evidence. He points to a section of Dr.

Fortin's report that appears to have been duplicated, but with inconsistent entries. For example, on page 2 of the report, the following appears: "SENSORY EXAM: Revealed intact pin, touch, vibration, proprioception, double simultaneous stimulation, stereognosis, and graphesthesia." Then, on page 3: "SENSORY EXAM: Reduced pin sensation in a glove and stocking distribution[.]" Palmer argues that these inconsistencies are serious because they might mean that Palmer was more limited than that reflected by his RFC.

The ALJ committed no error because not only does Palmer misconstrue what the regulations require, but the ALJ also took steps to account for the inconsistencies. When evidence in a medical opinion is inconsistent, the ALJ need only "weigh the relevant evidence and see whether [the ALJ] can determine whether [a claimant is] disabled based on the evidence [available]." 20 C.F.R. § 404.1520b(b). The regulations do not require an ALJ to explicitly address every inconsistency in a medical record. Furthermore, as the district court correctly explained, the ALJ addressed much of the confusion presented by those inconsistencies by adopting the report's more limiting language. For example, one section of Dr. Fortin's report says that Palmer's strength was 5/5 in all extremities; another section said his strength was 4/5 in his lower limbs. The ALJ's opinion adopted the 4/5 strength finding.

Palmer next criticizes the ALJ's failure to explain how an RFC limiting him to simple, repetitive tasks accounted for his pain- and fatigue-driven inability to concentrate. He believes that the ALJ should have analyzed his concentration problems in light of this court's case law regarding the effects of mental impairments on a claimant's ability to maintain concentration, persistence, or pace. *See, e.g., Winston v. Berryhill*, 923 F.3d 472 (7th Cir. 2019); *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015).

Palmer's arguments on this point are without basis—chiefly, because the ALJ did specifically address Palmer's pain and its effects on his concentration, concluding that Palmer's pain did not prevent him "from engaging in substantial gainful activity." This was a reasonable conclusion, given that none of Palmer's treating or consulting physicians described any pain-related concentration problems. (Palmer did mention pain-related concentration problems in his Function Report, but he did not give any indication of its severity). Further, in light of the lack of any medical opinions describing concentration problems and given Palmer's explanation at his hearing that his concentration difficulties stemmed mostly from pain-related sleeping problems, it

was not unreasonable for the ALJ to account for Palmer's concentration difficulties by limiting him to simple, repetitive tasks likely to require only limited concentration.

Finally, Palmer argues that the ALJ's RFC assessment disregarded his limitations relating to his activities of daily living. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). Specifically, Palmer says that the ALJ spoke too broadly of his ability to maintain his own personal care (his wife sometimes helped him into and out of the shower); to perform household tasks (the tasks were of short duration); to fish (he did so only when accompanied); and to drive (he did so only over short distances).

Palmer appears to have misread the ALJ's opinion, because most of his assertions are simply not accurate. For example, the ALJ *did* note Palmer's testimony that he could only drive short distances: he pointed to Palmer's Function Report where Palmer said he "can't drive far." He noted that Palmer says he "sometimes gets help getting in and out of the shower." And though the ALJ did not mention that Palmer now fishes only when accompanied, the ALJ did note that Palmer was limited to fishing beside the water, as opposed to in a boat. True, the ALJ did not mention that some of the household tasks he performs, such as laundry and sweeping, were of short duration—but Palmer does not explain (nor do we see) how this omission prejudiced him. To the extent that Palmer argues that the ALJ did not properly weigh the evidence, it is not our role to reweigh it. *See Alvarado v. Colvin*, 836 F.3d 744, 747 (7th Cir. 2016).

AFFIRMED